**THE BASIL LAW GROUP, P.C.**
Robert J. Basil, Esq. (025721988)
David A. Cohen, Esq. (045581990)
Sean Collier, Esq. (027192010)
125 West 31st Street, Suite 19-B
New York, New York 10001
Telephone: (917) 994-9973
robertjbasil@rjbasil.com
davidacohen@rjbasil.com
seancollier@rjbasil.com
*Attorneys for Plaintiff Fintech Consulting LLC*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| FINTECH CONSULTING LLC d/b/a APTASK,<br><br>Plaintiff,<br><br>vs.<br><br>TSR, INC.; QAR INDUSTRIES, INC.; ROBERT E. FITZGERALD; and BRADLEY TIRPAK,<br><br>Defendants. | Civil Action No. 2:21-20181-KSH-AME<br><br>Honorable Katharine S. Hayden, U.S.D.J.<br>Honorable André M. Espinosa<br><br>CIVIL ACTION<br><br>**FIRST AMENDED COMPLAINT** |

FINTECH CONSULTING LLC, by its attorneys, The Basil Law Group, P.C., by way of amended complaint against the Defendants, says:

**PARTIES**

1. Plaintiff Fintech Consulting LLC (**"Fintech"**) is a limited liability company organized pursuant to the laws of the State of Delaware, with its principal place of business at 120 South Wood Avenue, Suite 300, Iselin, New Jersey 08830.

2. Defendant TSR, Inc. (**"TSR"**), is a corporation incorporated pursuant to the laws of the State of Delaware, with its principal place of business at 400 Oser Avenue, Hauppauge, New York 11788.

- 1 -

3. Defendant QAR Industries, Inc. ("**QAR**"), is a corporation incorporated pursuant to the laws of the State of Texas, with its principal place of business at 101 SE 25th Avenue, Mineral Wells, Texas 76067.

4. Defendant Robert E. Fitzgerald ("**Fitzgerald**") is an individual resident of the State of Texas with a business address of 101 SE 25th Avenue, Mineral Wells, Texas 76067. At all times relevant, Fitzgerald has been a director and shareholder of TSR, and therefore he is an insider of TSR. Additionally, at all times relevant, Fitzgerald has been the President, a director, and/or a majority shareholder of QAR. As such, Fitzgerald's knowledge is imputed to QAR.

5. Defendant Bradley Tirpak ("**Tirpak**") is an individual resident of the State of Colorado with an address of 101 East Bleeker Street Unit A, Aspen, Colorado 81611. At all times relevant, Tirpak has been, among other things, a director, the chairman of the board of directors, and a shareholder of TSR, and therefore he is an insider of TSR.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Fintech's principal causes of action allege violation of the Securities Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*), and Securities and Exchange Commission Rule 10b-5 (17 C.F.R. § 240.10b-5), and therefore arise under the laws of the United States.

7. This Court has jurisdiction over Fintech's state-law cause of action pursuant to 28 U.S.C. § 1367 because that cause of action arises from the same transaction and the same conduct among the same parties as form the bases of the cause of action arising under the laws of the United States, and differs only insofar as it proceeds under a cause of action based in state law.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because, among other things, Fintech is an entity which, as Defendants have at all relevant times been aware, maintains

its principal place of business in Iselin, northern Middlesex County, New Jersey, and Defendants caused it harm with respect to a contract that Defendants induced Fintech to enter while Fintech was operating there.

## FACTS

9. TSR is a publicly traded company whose shares are listed on the NASDAQ exchange under ticker symbol TSRI.

10. At all times relevant to this case, and before February 2021, Fintech was a holder, of record and beneficially, of 376,000 shares of the issued and outstanding common stock of TSR.

### TSR'S 2020 Equity Incentive Plan

11. On October 26, 2020, TSR filed with the SEC its SEC Form DEF 14A, a proxy statement in which, among other things, TSR's board of directors recommended that the company's stockholders approve the 2020 Equity Incentive Plan (the **"Incentive Plan"**) that the board had approved and that it was proposing for adoption at the shareholders' meeting scheduled for November 19, 2020. A true and correct copy of relevant excerpts of that proxy statement (without exhibits) is attached hereto as **Exhibit A**.

12. In the proxy statement, TSR described the proposed Incentive Plan as allowing for "the grant of non-qualified stock options, incentive stock options, restricted awards, stock appreciation rights . . . , cash awards, performance share awards and other equity-based awards to employees, consultants, [and] directors . . . ," among other persons. (Ex. A at 31.)

13. The complete proposed Incentive Plan was appended to that proxy statement filed with the SEC. A true and correct copy of relevant excerpts of that proposed Incentive Plan is attached hereto as **Exhibit B**.

14. In the proposed Incentive Plan, Section 8 provided for "Restricted Awards," defined as "an Award of actual shares of Common Stock ('**Restricted Stock**') or hypothetical Common Stock Units ('**Restricted Stock Units**') having a value equal to the Fair Market Value of an identical number of shares of Common Stock, which may, but need not, provide that such Restricted Award may not be sold, assigned, transferred or otherwise disposed of, pledged or hypothecated as collateral for a loan or as security for the performance of any obligation or for any other purpose for such period (the **'Restricted Period'**) as the Committee shall determine."

15. The proposed Incentive Plan explained at Section 3.4 that this "Committee" would in all events be made up of members of TSR's board of directors.

16. The proposed Incentive Plan also provided, at Sections 3.3 and 3.4, that this "Committee" would be responsible for administering the Incentive Plan, including broad discretion as to the granting of all restricted stock and the particular restrictions that would apply to it. Additionally, "if no Committee has been appointed," then this responsibility defaulted to TSR's board.

17. As shown in the proxy statement filed on October 26, 2020 (Exhibit A hereto, at 9), at the time of the plan's proposing and continuing through the events giving rise to this action, the only three members of TSR's board were defendants Tirpak and Fitzgerald and non-defendant H. Timothy Eriksen.

18. However, the proposed Incentive Plan did not explain the terms pursuant to which a restricted award would be made, nor the proposed timing of the grants that may have been under consideration at the time of the plan's drafting, if any.

- 5 -

19.     Rather, the precise restrictions and parameters that would be applicable to any given grant of this restricted stock pursuant to the Incentive Plan was left up to the discretion of this "Committee" of TSR's directors, if not the board of directors itself.

20.     No explanation of how such grant would be determined or made was filed with the SEC or otherwise disclosed to the public or to Fintech between TSR's October 26, 2020 filing of its proxy statement and the stock purchase giving rise to this action.

21.     Notably, the Incentive Plan further provided that "Each Restricted Award granted under the Plan shall be evidenced by an Award Agreement" and must be subject to the terms of Section 8 of the Plan and such other terms "as may be reflected in the applicable Award Agreement."

22.     In other words, if TSR's stockholders were to approve the Incentive Plan, then no Restricted Award could occur except as defined in an accompanying "Award Agreement."

23.     Yet no form of proposed Award Agreement was filed with the proxy statement. In fact, no form or final Award Agreement was at any time publicly filed or disclosed prior to the stock purchase giving rise to this action.

24.     TSR's stockholders approved the Incentive Plan by vote on November 19, 2020, in exactly the form in which it had been proposed.

### Defendants surreptitiously time their purchase of Fintech's shares to coincide with their restricted stock awards

25.     Beginning in or about late 2020, Fintech expressed to one or more of TSR's directors and officers that Fintech was interested in selling its shares of TSR. However, during that time period, no sale was arranged.

26. On January 27, 2021, Fitzgerald contacted Fintech's president, Taj Haslani, to indicate that he had "recently sold a building" and was "looking for places to put the money." Fitzgerald asked whether Fintech was still interested in selling its TSR shares. Haslani responded that Fintech was indeed interested, that any sale would have to be of all of Fintech's shares, and that Fitzgerald should make an offer if interested.

27. On that same date, TSRI was trading on the public marketplace (NASDAQ) at between $7.12 and $7.63 per share. This pricing was in line with the share prices reported during the preceding two months, which were between $6.20 and $7.85.

28. On that same afternoon of January 27, 2021, Fitzgerald proposed to Haslani a sale of Fintech's stock for a per-share price of $7.00, and, notably, asked whether the transaction could close "before Feb 5???" Friday, February 5th was only seven business days away.

29. Haslani countered with a demand for no less than $7.25, and Fitzgerald subsequently agreed.

30. Fitzgerald told Haslani that Fitzgerald had also notified TSR's directors and senior management that the transaction appeared imminent and offered them the opportunity to participate. TSR's board chairman, defendant Tirpak, indicated his desire to do so.

31. By the next afternoon, January 28, 2021, Fitzgerald sent to Fintech a proposed Share Purchase Agreement showing QAR and defendant Tirpak as the purchasers of Fintech's 376,000 shares. Fitzgerald's email transmitting the proposed agreement stated, among other things, "Hopefully we can wind things up quickly."

32. Unbeknownst to Fintech, on exactly the same date, January 28, 2021, several things were happening behind the scenes at TSR.

33. First:

> [T]he Board of Directors of TSR, Inc. (the "Company") adopted a form restricted stock grant notice and restricted stock purchase agreement for restricted stock awards to be granted under the Company's 2020 Equity Incentive Plan. A copy of the agreement is filed with this Current Report on Form 8-K as Exhibit 10.1, and is incorporated herein by reference.

However, this was not made known at the time. The text quoted above is from TSR's SEC Form 8-K publicly filed with the SEC four days later, on February 1, 2021. A true and correct copy of this filing is attached hereto as **Exhibit C**.

34. Moreover, TSR's filing of that Restricted Stock Grant Notice and Restricted Stock Purchase Agreement referred to above, which was attached as Exhibit 10.1 to that Form 8-K filed on February 1, 2021, marks the first time that TSR disclosed to any person not an insider to the company the dates of any proposed restricted stock grants, the number of shares to be granted, and all other pertinent details of such grants. A true and correct copy of these draft documents, originally filed as Exhibit 10.1 to TSR's Form 8-K filed on February 1, 2021 (Exhibit C above), is attached hereto as **Exhibit D**.

35. The draft Restricted Stock Grant Notice and Restricted Stock Purchase Agreement are complex. It is obvious that they were in preparation for some time prior to their approval by defendant Fitzgerald, defendant Tirpak, and the other member of TSR's board on January 28, 2021.

36. Then, also on January 28, 2021, the very same date that TSR's board approved the form of the agreement and award notice pursuant to which a restricted stock award would be made under the Incentive Plan, TSR's board actually granted restricted stock awards to five highly placed TSR officers and all three members of TSR's board of directors, including defendants Fitzgerald and Tirpak.

37. According to the filings by TSR of the SEC Form 4, each of these was a "restricted stock award granted under the TSR, Inc. 2020 Equity Incentive Plan."

38. However, as with the January 28, 2021 approval by TSR's board of the draft Restricted Stock Grant Notice and Restricted Stock Purchase Agreement pursuant to which these awards were to be noticed and conditioned, the same-day grant of these awards was not made public until TSR made these SEC Form 4 filings with the SEC several days later, on February 1, 2021. True and correct copies of these forms as filed on that date are attached hereto as **Exhibit E**.

39. The forms show that the grants totaled 155,000 shares of common stock, all granted at a purchase price of zero dollars.

40. Whether before, on, or after January 28, 2021, no Defendant mentioned or disclosed to Fintech, NASDAQ, the SEC, or to members of the investing public, either the preparation of the draft Restricted Stock Grant Notice or the Restricted Stock Purchase Agreement, their approval by TSR's board, or the grant of the 155,000 restricted stock awards. The manner in which the restricted stock would be awarded was completely concealed to all non-insiders until TSR finally revealed these details in its public filings made on February 1, 2021.

41. Further, at no time during Fintech's negotiations with Defendants did any Defendant or any other person disclose to Fintech, NASDAQ, the SEC, or to the members of the investing public the non-public information that caused TSR to make these simultaneous grants to these insiders.

42. Instead, Fitzgerald, Tirpak, Fintech, and Fintech's counsel (the undersigned) worked on the draft purchase agreement over the weekend of January 30 through 31, 2021, with Fitzgerald expressing his desire to execute the final agreement on Monday, February 1, and to close the transaction the next business day.

43. Upon information and belief, Fitzgerald's urging was motivated by his desire, and the desire of the other Defendants, to close the purchase of Fintech's shares before Fintech could find out about the large grants to them of restricted stock which had already been made even while negotiations with Fintech were still ongoing, and before TSR would publicly disclose the board's approval of the terms and timing pursuant to which all such grants would be made.

44. Upon information and belief, in order to obtain a more favorable price for Fintech's shares, Fitzgerald and the other Defendants deliberately concealed the information and events described above in order to prevent Fintech from obtaining material information that would allow it to better assess the value of those shares.

45. As a result of Fitzgerald's urgings, the parties executed the final Share Purchase Agreement around noon on February 1, 2021 (the **"SPA"**).

46. Among other provisions in the SPA, the executed SPA provided that QAR and Tirpak would pay the $2,726,000 purchase price to Fintech for its 376,000 shares of TSRI, with Tirpak paying $199,998.50 to acquire 27,586 shares and QAR paying $2,526,001.50 to acquire 348,414 shares.

47. These shares and funds were exchanged the following day, February 2, 2021.

48. Despite following the relevant public disclosures available to it, Fintech has been unable to date to ascertain the non-public information that caused TSR to make the simultaneous grants.

**Defendants concealed material, non-public information**

49. The restricted shares at issue were awarded as follows:

Table 1
Restricted Stock Awards Made on January 28, 2021

| Individual | Status | Shares awarded | Date of first disclosure |
|---|---|---|---|
| Howard T. Eriksen | Director of TSR | 30,000 | February 1, 2021 |
| Robert E. Fitzgerald | Director of TSR | 30,000 | February 1, 2021 |
| Bradley M. Tirpak | Director of TSR | 30,000 | February 1, 2021 |
| Thomas C. Salerno | Chief Executive Officer of TSR | 40,000 | February 1, 2021 |
| John G. Sharkey | Senior Vice President of TSR | 25,000 | February 1, 2021 |

(*See* Exhibit E hereto.)

50. As provided by Sections 3 and 8 of the Incentive Plan, the grants identified in Table 1 were made at the behest of a committee made up entirely of TSR's directors. All three of these directors, including defendants Fitzgerald and Tirpak, were recipients of those grants.

51. These grants to the persons shown in Table 1 was an event that market participants and observers would find meaningful.

52. These transactions, both individually and as a group, constituted a significant, coordinated grant of TSRI shares to TSR insiders, made at the behest of a committee comprised of members of TSR's board, every single member of which was a recipient of that same grant.

53. Acquisition of a company's shares by insiders of that same company is an occurrence generally known to signal to the market that the insiders have good reason to expect an increase in the value of the company's shares.[1]

54. A common reaction of the market to such a signal, once the signal has been evaluated by the investing public, is to value the company's shares significantly more highly, leading to increased demand and a concomitant and substantial increase in share price.

55. At all times relevant, each of the Defendants knew that this reaction is a recognized phenomenon and/or was highly likely to be the market's response.

56. At all times relevant, Defendants also knew that a coordinated grant of restricted stock as significant as the one that the directors of TSR initiated on January 28, 2021, would be highly likely to lead to an increase in the value of TSRI stock, as soon as the market detected it.

57. That the individual Defendants had received and even participated in the making of this grant on January 28, 2021, was therefore an item of information that was material to the transaction for sale of TSRI stock, and to any potential party contemplating a transaction for the sale of TSRI stock, such as the transaction that Fintech was negotiating with Fitzgerald, QAR, and Tirpak at the very time of the grant, and which was memorialized in the SPA just a few days later.

58. TSR's board of directors—including defendants Fitzgerald and Tirpak—and senior management had been aware since at least January 27, 2021, that Fintech was in negotiations to sell all of its 376,000 shares of TSRI common stock to TSR insiders.

59. Despite the foregoing, no Defendant disclosed to Fintech, before Fintech's agreement to sell TSRI stock pursuant to the SPA, that the substantial grant of restricted stock was

---

[1] Indeed, in articles advising buyers to watch for insider activity, legendary investor Peter Lynch is frequently quoted as observing that "insiders might sell their shares for any number of reasons, but they buy them for only one: they think the price will rise."

under consideration, that it had occurred, or the terms pursuant to which the restricted stock would be and was in fact awarded.

60. Instead, Defendants intentionally allowed Fintech to enter the SPA in ignorance of that information, securing a bargain price of $7.25 for the purchase of Fintech's TSRI shares before the news of the restricted stock grant could hit the market and drive the shares' value higher.

61. Defendants' concealment of this material information led Fintech to forego all opportunities to benefit from the possibility of an imminent rise in the stock price, of which Defendants were well aware but chose to keep Fintech uninformed for their considerable financial benefit.

62. The resulting stock movements before, during, and resulting from the Defendants' grants are as follows:

Table 2
TSRI Stock Activity January 22, 2021 through February 5, 2021

| Date | Open | High | Low | Close | Volume |
|---|---|---|---|---|---|
| Feb 05, 2021 | 9.89 | 18.73 | 9.80 | 12.88 | 363,000 |
| Feb 04, 2021 | 9.29 | 9.29 | 8.68 | 8.71 | 15,200 |
| Feb 03, 2021 | 9.25 | 9.48 | 8.93 | 8.95 | 22,100 |
| Feb 02, 2021 | 8.75 | 9.43 | 8.75 | 9.32 | 12,800 |
| Feb 01, 2021 | 8.63 | 9.25 | 8.00 | 8.59 | 8,500 |
| Jan 29, 2021 | 8.00 | 8.65 | 7.73 | 8.49 | 15,800 |
| Jan 28, 2021 | 7.42 | 8.00 | 7.36 | 7.75 | 15,400 |
| Jan 27, 2021 | 7.12 | 7.65 | 7.12 | 7.63 | 16,500 |
| Jan 26, 2021 | 7.07 | 7.31 | 7.02 | 7.12 | 18,800 |
| Jan 25, 2021 | 7.11 | 7.32 | 6.86 | 7.06 | 19,100 |
| Jan 22, 2021 | 6.55 | 7.06 | 6.55 | 7.06 | 2,900 |

63. Had Defendants given Fintech the aforementioned material non-public information, Fintech would have been able to assess the probability of an imminent rise in the

stock price resulting from this substantial insider activity.  Fintech could then have negotiated for a higher sale price, or elected to retain its shares in the reasonable expectation of benefiting from the price increase.

64. The undisclosed non-public information that caused TSR to grant and the insiders to accept the restricted stock proved valuable, as the price of the TSRI stock has continued to trade well above the price at the time of the restricted stock grant through the date of the commencement of this action.

65. Defendants' knowing omission of material information deprived Fintech of this opportunity and caused Fintech financial damages in excess of $75,000.

## COUNT I
### Violation of Section 10(b) of the Exchange Act of 1934

66. Fintech incorporates all of the allegations contained in the previous paragraphs of this First Amended Complaint as if fully set forth herein.

67. Defendants engaged in material misrepresentations and omissions of information regarding the Defendants' undisclosed receipt of restricted stock awards as set forth herein at paragraphs 9 through 64 of this Complaint.

68. Defendants' aforementioned material misrepresentations and omissions of information regarding the Defendants' undisclosed receipt of restricted stock awards were made and motivated by Defendants' wrongful and conscious misbehavior and intent to deceive and to commit fraud for the purpose of inducing Fintech to sell its shares of TSRI at a bargain price.

69. Defendants' aforementioned material misrepresentations and omissions were justifiably relied upon by Fintech in connection with Fintech's sale of the shares of TSRI at a bargain price to Fintech's detriment.

70. That the transactions and agreements represented by the wrongfully executed SPA are unenforceable and a nullity *ab initio*.

71. Fintech has suffered financial damage, proximately caused by the wrongs alleged herein, in an amount to be proved at trial.

## COUNT II
## Common Law Fraud

72. Fintech incorporates all of the allegations contained in the previous paragraphs of this First Amended Complaint as if fully set forth herein.

73. Defendants engaged in material misrepresentations and omissions of information regarding the Defendants' undisclosed receipt of restricted stock awards as set forth herein at paragraphs 9 through 64 of this Complaint.

74. Defendants' aforementioned misrepresentations and omission of information regarding the Defendants' undisclosed receipt of restricted stock awards were made and motivated by Defendants' wrongful and conscious misbehavior and intent to deceive and to commit fraud for the purpose of inducing Fintech to sell its shares of TSRI.

75. Defendants' aforementioned material misrepresentations and omissions were justifiably relied upon by Fintech in connection with Fintech's sale of the shares of TSRI at a bargain price to Fintech's detriment.

76. That the transactions and agreements represented by the wrongfully executed SPA are unenforceable and a nullity *ab initio*.

77. Fintech has suffered financial damage, proximately caused by the wrongs alleged herein, in an amount to be proved at trial.

WHEREFORE, plaintiff Fintech Consulting LLC demands:

a. Judgment declaring the transactions represented by the SPA a nullity *ab initio* and returning Fintech's shares of TSRI;

b. Judgment cancelling the SPA *ab initio* and returning Fintech's shares of TSRI in exchange for return of the purchase price;

c. Judgement unwinding the purchase and sale of the shares of TSRI between Fintech and Defendants;

d. Compensatory damages in favor of Fintech and against Defendants for all damages sustained as a result of Defendants' wrongful acts and omissions, in an amount to be proven at trial;

e. Punitive damages in favor of Fintech and against Defendants for Defendants' willful and wanton acts, in an amount to be determined at trial;

f. Pre-judgment interest;

g. Costs of suit including attorneys' fees; and

h. Such other relief as this Court finds appropriate.

THE BASIL LAW GROUP. P.C.
*Attorneys for plaintiff*
*Fintech Consulting LLC, d/b/a Aptask*

Dated: March 2, 2022         By: *s/ Robert J. Basil*
                                  Robert J. Basil (RB3410)